UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHNNY EFFINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:06-CV-01891-LSC |
| | ) | |
| CITY OF MIDFIELD, ALABAMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration a motion for summary judgment, which was filed by the City of Midfield, Alabama ("Midfield"), and Dwight Hackbarth ("Officer Hackbarth") (collectively, "Defendants") on November 1, 2007.  (Doc. 22.)  Plaintiff Johnny Effinger ("Effinger" or "Plaintiff") has sued Defendants for unlawful deprivation of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 ("§ 1983").  (Doc. 16.)  Specifically, Effinger contends that Officer Hackbarth used excessive force when he shot the plaintiff in the course of an apprehension and arrest for armed robbery on January 5, 2005.  (*Id*.)  Defendants have moved for

summary judgment on all of Plaintiff's claims. The issues raised in Defendants' motion have been briefed by both parties and are now ripe for review. Upon full consideration of the legal arguments and evidence presented by the parties, the motion for summary judgment will be granted in all respects.

II.    Facts.[1]

On January 5, 2005, at approximately 7:18 p.m., the AutoZone on Bessemer Super Highway in Midfield, Alabama, was robbed by two men armed with a Tech 9 firearm. The two men fled on foot across Bessemer Super Highway, and a witness saw the men enter a 1986 lime green Chevrolet Caprice with large custom-style wheels. The Chevrolet Caprice sped away, and the witness called police. The Chevrolet Caprice was owned and being driven by Effinger; Ricky Thirkeild ("Thirkeild") was his front seat passenger. (Doc. 21 at 3.)

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

According to Effinger, he was parked outside Church's Chicken across the street from the Bessemer Super Highway AutoZone on the evening of January 5, 2005. Thirkeild purchased food at the Church's Chicken; Effinger waited in his car and watched one of his televisions. Effinger testified that after Thirkeild returned to the car, two men jumped into the backseat, pointed a gun to his head, and told him to drive. Effinger complied. (Pl. Dep. at 61-75.)

At the time of the AutoZone robbery, Officer Hackbarth was working nearby at the Fairfield Highland Baptist Church. He heard a dispatch call on his radio, which reported the robbery and a description of the green Chevrolet Caprice. Officer Hackbarth, who was wearing his uniform and had his Midfield police vehicle, responded to the radio call with his vehicle's emergency lights and siren activated. Other Midfield police officers, including Jason Davis, Lane Stringfellow, and Matthew Romei, also headed to the scene. While en route to the AutoZone, the police officers spotted Effinger and the Chevrolet Caprice, and a chase ensued. (Doc. 21 at 3-4.)

At one point during the chase, Effinger stopped the car, and one of the men in the backseat got out and ran. Unbeknownst to the police officers,

the man exiting the Chevrolet Caprice had the Tech 9 and no other firearms remained in the vehicle. Effinger, however, drove away, and the police, including Officer Hackbarth, continued their pursuit. Officer Romei followed the man who ran from the vehicle. (*Id.* at 4.)

Effinger saw the police cars' emergency lights and knew the police wanted him to stop, but he kept driving. When Effinger made a left turn onto Milstead Road, Officer Hackbarth maneuvered his police car into the Chevrolet Caprice, which caused Effinger's car to spin to a stop. Officers Hackbarth and Davis approached the Chevrolet Caprice with guns drawn. Officer Hackbarth approached on the driver's side, and Officer Davis approached on the passenger's side. (*Id.* at 4-5.)

It is undisputed that an order was given for the car's occupants to show their hands. Instead of putting his hands on the steering wheel or in the air, Effinger opened his driver's door. In his own words, Effinger then "[p]ut [his] hands over the door showing [Officer Hackbarth his] hands. And with [his] other hand[, he] pointed to the back seat . . . ." (Pl. Dep. at 98.)

Officer Hackbarth testified that he was standing about ten to fifteen feet from the Chevrolet Caprice, but could not see into the vehicle because

of the tinted windows. (Hackbarth Dep. at 18.) The officers had received information that a robbery had been committed with a weapon and knew the car's occupants were potentially armed and dangerous. (*Id*. at 24.) The scene was tense. When the driver's door opened, Officer Hackbarth said that he could not see the driver's right hand and he thought the man was lunging out of the vehicle. (Hackbarth Dep. at 24-25.) Believing there was a threat to his own safety, Officer Hackbarth discharged his weapon and shot Effinger. (*Id*. at 24, 45.) The bullet entered the front side of Effinger's left forearm and exited the inside of the forearm. (Doc. 21 at 6.) Effinger concedes that the entire incident happened quickly, and estimated that from the time his car was stopped to the time he was shot, only twenty to twenty-five seconds had elapsed. (*Id*.)

Effinger, Thirkeild, and the other two men were arrested and charged with the AutoZone robbery. The charges were later dropped against Effinger and Thirkeild. (*Id*.)

It is undisputed that the Police Department of Midfield has an established policy, which describes the use of deadly and non-deadly force by its officers. This policy is consistent with "generally accepted law

enforcement policies and practices." (*Id.*) Officer Hackbarth had received training on the use of both deadly and non-deadly force, and that training was consistent with generally accepted law enforcement training. (*Id.* at 6-7.) At the time of his deposition, Officer Hackbarth testified that he had never used deadly force on any other occasion while making an arrest. (Hackbarth Dep. at 30.)

III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   Analysis.

Defendants argue that they are entitled to summary judgment because Officer Hackbarth used reasonable force on the night in question. Defendants also contend that even if this Court finds a constitutional

violation occurred, Officer Hackbarth is entitled to qualified immunity from suit and Plaintiff cannot establish a viable § 1983 claim against Midfield. (Doc. 22.)

    A.    Alleged Fourth Amendment Violation.[2]

When issues of qualified immunity are raised in cases like the one at hand, "courts are required to resolve a 'threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.'" *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* (quoting *Saucier*, 533 U.S. at 201). "Although this ordering contradicts [the] policy of avoiding unnecessary adjudication of

---

[2]Although Plaintiff references the Fourth and Fourteenth Amendments in both the Amended Complaint and Joint Status Report, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a [Fourteenth Amendment] 'substantive due process approach." *Carr v. Tatangelo*, 338 F.3d 1259, 1267 n.15 (11th Cir. 2003). The Fourth Amendment—not the Fourteenth Amendment—is the "proper basis for this claim." *Id.*

constitutional issues, [the Supreme Court has] said that such a departure from practice is necessary to set forth principles which will become the basis for a [future] holding that a right is clearly established." *Id.* (quotations and citations omitted).

"The standard for whether the use of force was excessive under the Fourth Amendment is one of 'objective reasonableness.'" *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

"In the context of deadly force, the Supreme Court has set out examples of factors that justify the use of such force:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).  The Supreme Court's examples say "something about deadly force but not everything, especially when facts vastly different from [those in the *Garner* decision] are presented." *Id.*  "The Supreme Court has cautioned that '*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force."'"  *Scott,* 127 S. Ct. at 1777.

"Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' we must 'slosh our way through the factbound morass of "reasonableness."'"[3] *Id.* (citations omitted).   "Therefore, determining whether 'the use of a

---

[3]With regard to what is "reasonable," the Eleventh Circuit Court of Appeals has stated the following:
> The Fourth Amendment's "reasonableness" standard and the standard of "reasonable care" under tort law are not the same.  An officer may fail to exercise "reasonable care" as a matter of state tort law yet still act reasonably in the federal constitutional sense.  "The United States Constitution [and] traditional tort law . . . do not address the same concerns." *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 666, 88 L. Ed. 2d 662 (1986) (concluding that "injuries inflicted by governmental negligence are not addressed by the United States Constitution") (Fourteenth Amendment case); *see also Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1324 (11th Cir. 2005) ("'Reasonable care' under tort law is not the same thing as reasonable safety within the meaning of the federal Constitution.") (Eighth Amendment case).

*Long,* 508 F.3d at 580 n.6.

particular type of force in a particular situation' is 'reasonable' in the constitutional sense requires a court to 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *Scott*, 127 S. Ct. at 1777-78). "In examining whether an officer's use of deadly force is reasonable, we recognize that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 397). "So '[w]e are loath to second-guess the decisions made by police officers in the field.'" *Id.* (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003)).

Effinger argues that Officer Hackbarth's actions were not reasonable because he contends: (1) both his feet were on the floorboard, under the steering wheel, when he was shot; (2) he was unarmed; (3) he showed his hands and said he was being robbed; (4) he had not committed any crime immediately prior to being shot; (5) Officer Hackbarth stood ten to fifteen feet away and stared at him for "approximately three seconds" before

shooting; (6) Officer Hackbarth admits he did not give any commands before shooting; and (7) although the incident occurred at night, the police officers had good visibility from a nearby street light. (Doc. 25 at 12.)

However, the unrefuted facts paint a different story from Officer Hackbarth's perspective while on the scene, which is the perspective from which this Court must gauge the "reasonableness" of his actions. *Long*, 508 F.3d at 580. There is no admissible evidence to dispute that, at the time of the shooting, Defendant Hackbarth was aware: (1) an armed robbery had been committed; (2) the robbers had been seen entering a lime green Chevrolet Caprice with large custom-style wheels; (3) after chasing a lime green Chevrolet Caprice matching the suspect car in question, the vehicle stopped and a man jumped out and ran; (4) although the Chevrolet Caprice was being pursued by police vehicles with flashing lights and sirens, Effinger continued to flee police even after stopping;[4] (5) Effinger did not stop his car until Officer Hackbarth maneuvered his police car into the vehicle and

---

[4]The parties dispute the speed at which Effinger drove his car. Defendants contend that the Chevrolet Caprice was driving at speeds of 60-70 miles per hour. (Hackbarth Dep. at 15-16.) Plaintiff maintains that he was traveling at a rate of "probably" fifteen or twenty miles per hour. (Pl. Dep. at 79.) This dispute is not relevant to the Court's determination.

caused the Chevrolet Caprice to spin to a stop;[5] (6) the incident occurred at night and Effinger's windows were tinted, making seeing inside the vehicle difficult—if not impossible; (7) Officer Hackbarth and the other police officers believed that the individuals in the car had at least one, if not more, firearms; (8) orders were given for the individuals in the car to show their hands;[6] (9) Effinger opened his car door; (10) it was Officer Hackbarth's impression that Effinger was lunging out of the vehicle when the door was opened; (11) Officer Hackbarth could not see Plaintiff's right hand;[7] and (12) the whole incident, from the time the car spun to a stop to

---

[5]Effinger also admits that if he had not spun out, he would have continued to drive from the police. (Pl. Dep. at 95-96.)

[6]There is an interesting dispute over whether Officer Hackbarth gave an instruction for the vehicle's occupants to show their hands. Plaintiff testified that Officer Hackbarth did. (Pl. Dep. at 97.) Officer Hackbarth says he did not. (Hackbarth Dep. at 38-39.) It is undisputed, however, that a police officer(s) gave instructions for those in the vehicle to show their hands, and Effinger heard those orders and was aware of the fact that officers were standing outside his car with guns drawn.

[7]Plaintiff claims that he showed both hands, but then admits that he pointed to the back seat with his right arm. (Pl. Dep. at 98, 104.) His testimony does not refute Officer Hackbarth's statement that he could not see Effinger's right hand immediately prior to the shooting. (Hackbarth Dep. at 24, 36.) Moreover, the court notes that it is undisputed that the bullet from Officer Hackbarth's gun entered the front side of Effinger's left forearm (Doc. 21 at 6), which indicates that Effinger's left hand was not raised in the air with palm facing Officer Hackbarth at the moment he was shot.

the time Effinger was shot, occurred in a matter of seconds.[8]

These undisputed facts reveal a situation that unfolded quickly and was rife with uncertainty for the police officers involved. The information garnered prior and during the chase would lead a reasonable officer to believe that the individuals in the car were armed and dangerous, and Officer Hackbarth acted accordingly when he believed his physical safety was in danger. Although, in hindsight, a warning may have prevented Effinger's gunshot injury, "[f]or all [Officer Hackbarth] knew, the hesitation involved in giving a warning could readily cause such a warning to be his last." *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) (quoting *McLenagan v. Karnes*, 27 F.3d 1002, 1006-07 (4th Cir. 1994)).

As stated by the Fourth Circuit in *McLenagan*, a case cited with approval by the Eleventh Circuit:

> We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must

---

[8]With regard to the shooting itself, Effinger claims that Officer Hackbarth stared at him for "about three" seconds before shooting. (Pl. Dep. at 98.) Officer Hackbarth testified a "split second" elapsed between the time that the car door opened and he shot the plaintiff. (Hackbarth Dep. at 39.) This dispute is not material to the Court's decision in this case. It is undisputed that approximately twenty-five seconds elapsed between the time that Effinger's car spun to a stop and when he was shot, and the situation unfolded very quickly. (Pl. Dep. at 100.)

>always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life.
>
>. . . It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [the suspect] was unarmed. We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others.

*McLenagan*, 27 F.3d at 1007-08, *quoted in Carr*, 338 F.3d at 1269 n.19 (emphasis omitted). Accepting the facts of this particular case in the light most favorable to the plaintiff, it is this Court's conclusion that Officer Hackbarth's actions were objectively reasonable under the Fourth Amendment.

    B.    Entitlement to Qualified Immunity.

Even if Officer Hackbarth's actions violated Effinger's Fourth Amendment rights, he is clearly entitled to qualified immunity. "[T]he purpose of the qualified immunity doctrine is to give meaning to the proposition that '[g]overnment officials are not required to err on the side of caution' when it comes to avoiding constitutional violations." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007) (citing Crosby v. Monroe, 394 F.3d

1328, 1334 (11th Cir. 2004) (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc))). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Defendants, in their individual capacities, are entitled to qualified immunity unless their 'supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances.'" *Id.* (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002).

Plaintiff has "the burden of demonstrating that [Officer Hackbarth]—at the pertinent time and given the specific circumstances of this case—had fair notice that [his] conduct would violate clear federal law." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002)). "To demonstrate that the law at the time clearly established that [Officer Hackbarth's] conduct would violate the Constitution, [Plaintiff] might point to either (1) earlier case law from the Supreme Court, this Court, or the highest court of the pertinent state that is materially similar to the current case and

therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of [Officer Hackbarth's] conduct." *Id*. (citing *Mars*h, 268 F.3d at 1031-33 & nn. 9-10; *Willingham v. Loughnan*, 321 F.3d 1299, 1301-03 (11th Cir. 2003); *Vinyard*, 311 F.3d at 1349-53). "And 'where the applicable legal standard is a highly general one, such as "reasonableness," preexisting case law that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law.'" *Id*. (quoting *Thomas v. Roberts*, 323 F.3d 950, 954 (11th Cir. 2003)).

Effinger has not cited any "controlling or materially similar case law" that establishes Officer Hackbarth's use of deadly force on the night in question clearly violated Plaintiff's Fourth Amendment rights. *See id*. In fact, Plaintiff never argues that any such law exists—nor does he assert that this is an "obvious clarity" case. (Doc. 25.) Therefore, Officer Hackbarth is entitled to qualified immunity and Effinger's claims against him must be dismissed.

C.     City of Midfield.

Because this Court has concluded that there was no violation of Effinger's Fourth Amendment rights, Plaintiff's § 1983 claim against Midfield must also be dismissed.

Moreover, even if a constitutional violation had been established, Plaintiff has not cited to any legal authority that supports an argument that the requisite "policy" or "custom" existed to succeed on a claim of municipal liability.  *See, e.g.*, Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1145 (11th Cir. 2007) ("But it is by now axiomatic that in order to be held liable for a § 1983 violation, a municipality must be found to have itself caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory. . . . . Thus, [a plaintiff] can only succeed on [his/]her § 1983 claim against [a municipality] by showing that [his/]her injury was the result of the city's unlawful 'policy or custom.'")  According to the law of this circuit, then, the argument is waived.[9]  *See Flanigan's*

---

[9]The Court notes that even if it assumed a "policy or custom" argument was not waived, Plaintiff has not introduced sufficient evidence to meet his burden and survive summary judgment on this issue.  Namely, Effinger has not introduced evidence of an unlawful "policy or custom," and he has not presented suitable evidence that shows his injury was a result of that unlawful "policy or custom."

*Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument).

V.   Conclusion.

Therefore, for the reasons set forth above, Defendants' motion for summary judgment is due to be granted in all respects.  A separate order will be entered.

Done this 5th day of February 2008.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671